HENRY D. EGGERS, Trustee, Appellant, v. WILLIAM PAUSTIAN, Appellee.

LANDLORD AND TENANT: Notice to Quit as Eviction. The act of the landlord in serving on his tenant a notice to quit and surrender the premises, and the act of the tenant in complying with said notice, may, in and of itself, constitute an eviction. Evidence held to present a jury question.

*Appeal from Tama District Court.*—B. F. CUMMINGS, Judge.

JANUARY 11, 1921.

SUIT upon a note given for rent of real estate, upon which concededly there was due $650, unless defendant prevailed in his counterclaim in some amount. The execution of the note was admitted by the defendant, who pleaded a counterclaim for damages because of the alleged eviction of defendant by plaintiff before the expiration of the lease. Trial to a jury, and ver-

dict and judgment for plaintiff for $237.64, so that defendant
was allowed about $400 damages on his counterclaim. The
plaintiff appeals.—*Affirmed.*

*C. H. E. Boardman* and *W. T. Bennett,* for appellant.

*J. R. Caldwell,* for appellee.

PRESTON, J.—The case has been here before. *Eggers v.
Paustian,* 184 Iowa 1250. The issues are the same. The case was
reversed on the former appeal, because the court excluded evi-
dence offered by plaintiff tending to show that defendant was
not evicted, but that he voluntarily surrendered the premises
because of an agreement between the parties, and because the
court erred in excluding evidence given by defendant on a
former trial, tending to show that defendant surrendered the
premises voluntarily, and not as the result of a constructive
eviction. The opinion states that, had the evidence been ad-
mitted, the court could not have peremptorily instructed that the
written notice to quit, of December 24th, constituted an evic-
tion. The defendant surrendered the premises on February
28th thereafter. The question on this appeal is whether defend-
ant voluntarily surrendered the premises or was evicted. It is
argued by appellant that the mere service of a notice to quit is
not an eviction. The argument is that the trial court did peremp-
torily so instruct the jury. The case was presented on the
counterclaim. The court placed the burden of proof upon the
defendant as to the eviction, and upon plaintiff as to his claim
that the lease was voluntarily canceled by agreement of the
parties on October 9, 1915.

The instructions state substantially that any act by the
landlord of such a character as to deprive the tenant of the bene-
fits, use, and enjoyment of the leased premises is an eviction;
that the undisputed evidence shows that, on December 24, 1915,
plaintiff caused written notice to quit and surrender the prem-
ises to be served on the defendant; that the service of such notice,
followed by the surrender of the premises, constituted an evic-
tion; and that the legal effect of such notice was to terminate
the lease March 1, 1916, unless such notice was given in accord-

ance with an agreement between the parties that possession would be surrendered upon giving such notice; but that, if the possession was surrendered by defendant in accordance with an agreement, as claimed by plaintiff, and not solely because of the written notice to quit and surrender, and if such surrender of possession was voluntary on the part of the defendant, then defendant would not be entitled to damages; and further, that, if the jury should find that, about October 9, 1915, plaintiff and defendant entered into an oral agreement by which defendant agreed to surrender the premises on March 1, 1916, and that, by mutual agreement between them, the lease was then to terminate, and if possession was given in accordance with such agreement, then defendant could not recover; and further, that, if the jury should fail to find that there was such an agreement, the jury should then proceed to consider the counterclaim. Under these instructions, we think appellant's contention that the court peremptorily directed the jury that the mere service of the notice, followed by a surrender, would amount to an eviction, cannot be sustained. The court submitted to the jury the disputed question of fact as to whether there was an agreement to cancel the lease, or whether defendant surrendered the premises solely because of the breach of the contract on plaintiff's part, in serving the notice to quit. The evidence which was excluded on the former trial was admitted in the second trial, as was the evidence in regard to defendant's efforts at renting another farm, prior to December 24th; and these circumstances were before the jury, as bearing upon the disputed issue. Though plaintiff's evidence tends to show such an agreement, and the circumstance as to defendant's looking for another place contradicted defendant's evidence, there was a jury question.

It is true, as contended by appellant, that defendant said that, from the time Eggers and Hagedorn were out to his place in October, he quit ploughing, and did nothing further with reference to running the place next year,—abandoned his plans for running the farm another year, and tried to get another place; and that, on March 1, 1916, he had all his property off the farm. But his testimony must be taken all together. His other evidence, stated briefly, is that plaintiff, Hagedorn, and others came out to the place in October, and told him they had sold the

farm; that he didn't know about the terms of the lease at that time; that he didn't have it, because it was in the bank in Glad-brook; and that he did not know, at that time, in regard to the provision in the lease about selling upon giving 60 days' notice; that he learned that afterwards, after he got the contract, which was some time after they were out there in October; that, when he looked at another farm, he didn't know but that he had to get off. He says:

"I left at the end of one year, because they served a written notice on me and told me I had to get off. I was prepared to farm the place during the remainder of the lease, and would have so continued. I fall-ploughed 15 acres in the fall of 1915, hauled out 325 loads of manure in the spring and fall of 1915, and built 282 rods of fence in the spring and fall of 1915. I quit the place because I got that written notice. I left it just on account of them serving that notice on me. The notice to quit was served December 24, 1915, and I then decided to leave. Mr. Hagedorn said to me, when they were out there in October, that he had bought the place, and that he was going to see whether he could get possession March 1, 1916."

He says, too, that, when Mr. Eggers and the others were out there, October 9th, Eggers asked him if he couldn't look through the house that day, and defendant told him "No," that he could not, as long as he lived there; and that he told plaintiff that he had the farm leased for three years; that, when he was looking for a farm after he got the contract from the bank, it was because he thought they had the right, under the contract, to sell the farm, and he thought he had to get off; and that, from the time the other parties were out there, he thought he had to get off; that plaintiff did not, at any time, indicate to him, after their meeting in October, that they would not put him off the place; and that thereafter, on December 24th, he got a notice to quit. It is undisputed that plaintiff gave the notice, and he did not waive it after it was given. Plaintiff says: "I knew what was in it when I sent it. I never told him I wouldn't do that." It appears from the evidence, without dispute, that the notice was given under the clause in the lease giving plaintiff the right to sell, upon giving defendant 60 days' notice. It

should be remembered that defendant's looking for another farm, etc., was before the reformation of the lease striking out the provisions in reference to plaintiff's right to sell. The reformation was on defendant's plea, before the trial to the jury, and was after defendant had surrendered possession; so that the jury may have believed defendant, when he says that, at the time in October or November, when he was looking for another farm, he supposed they had a right to sell, under the lease, and that he had to get off. Defendant denies that he surrendered voluntarily, and denies that there was any agreement to cancel the lease. This being so, we think there was a jury question, and that the verdict, though there is a conflict, is supported by the evidence. The jury could have found from the evidence that plaintiff did not change his position, or intention of terminating the lease, and that plaintiff's purpose and intention were to oust the defendant by legal process, if he resisted and did not vacate. Plaintiff had a purchaser for the property before the service of the notice to quit, which was known to the defendant. It seems that the sale later fell through. Plaintiff rented the land for the next year at a higher rental than defendant was paying. Plaintiff testifies that Hagedorn failed in his payment on February 1, 1916, and that when he, plaintiff, went to the bank, he saw the notice that defendant had left, and that he would claim damages of plaintiff. Plaintiff did not say anything to defendant about the trade's having fallen through. We do not understand appellee to dispute appellant's legal proposition that, if plaintiff and defendant agreed to cancel the lease, or if defendant voluntarily surrendered possession of the leased premises, such surrender would preclude the recovery of damages for eviction. Appellant cites *Wright v. Everett*, 87 Iowa 697, 700, *Kean v. Rogers*, 146 Iowa 559, 563, and other cases, to the point that to merely serve a notice to quit does not constitute an eviction, where there is no force, no entry, and the tenant leaves before the expiration. In the *Wright* case, it was held that, where the lessee had failed to properly cultivate the farm, as agreed in the lease, and was unable to do so for lack of teams, and the lessor served notice to quit in January, and the following spring entered upon the farm and proceeded to cultivate it, without objection from the lessee, who soon afterwards quit, without the

use of force to eject him, the possession by the lessor was not wrongful. The case is not quite in point, because the evidence in the cited case shows that the tenant assented to the lessor's taking possession, and that he voluntarily quit. That case does not hold, as contended by appellee, that the serving of the notice to quit does not, under proper circumstances, constitute an eviction, when possession is surrendered thereunder. The *Wright* case was distinguished in *Tarpy v. Blume,* 101 Iowa 469, 471.

In the instant case, the jury could have found, from all the evidence, that defendant did not assent to plaintiff's taking possession, and that he did not allow it to be done without objection. In the *Tarpy* case, a notice was served, requiring the tenant to quit before the expiration of the lease, and the lessor took possession without the consent of the tenant. The court said:

"The court found that defendant unlawfully evicted the plaintiff. It is argued that, as no force was used, there was no eviction; that the service of the notice was not, of itself, an eviction. The purpose of the law, in providing for the service of such notices, is to prevent the use of force. The law does not encourage violence by holding that, in the face of such a notice, the tenant must remain until he is ousted by force, before he can claim to have been unlawfully evicted."

In the *Kean* case, it was held that there was a mutual surrender of the lease.

Under the evidence, there is no question that, at the time of the service of the notice to quit, and prior thereto, plaintiff supposed that, under the lease, he had a right to terminate the lease and dispossess the defendant, and that defendant, at that time, before the reformation of the lease, had the same idea. He testifies that he thought he had to get out. There is no doubt, either, that plaintiff expected and intended to follow up the notice to quit by an action to obtain possession, if defendant did not surrender the premises without suit. Plaintiff says he knew what was in the notice, and that he meant what he said. In some cases,—for instance, in a tenancy at will,—the notice to quit is a recognized method of terminating the tenancy. Code Section 2991. A notice to quit is a condition precedent to an

action for forcible entry and detainer, or to recover possession by the landlord. 19 Cyc. 1143; 24 Cyc. 1402.

As we understand appellant's argument, the notice to quit would have no legal effect; but we think it has. It has been held that, when a valid notice to quit is given by the landlord or tenant, the party to whom it is given is entitled to count upon it. *Western Union Tel. Co. v. Pennsylvania R. Co.,* 120 Fed. 362, 385, citing 1 Wood on Landlord and Tenant (2d Ed.), Section 44. See, also, *Wisner v. Richards,* 62 Wash. 429 (Ann. Cas. 1912 D 162, Note); *Kitchen v. Pridgen,* 48 N. C. 49 (64 Am. Dec. 593).

Possibly, if the landlord tells the tenant to quit, and the tenant does so, and that is all there is to it, it would amount to an accepted surrender. Under the authorities, it appears that the ancient rule of the common law, that entry and expulsion or some real disturbance of the possession were required to establish eviction of a tenant by his landlord, has been so far modified in favor of the tenant that actual ouster or physical dispossession is no longer necessary to constitute an eviction. 16 Ruling Case Law 686, Section 171, and cases. The same volume, at page 688, states the rule to be that the intention of the landlord to evict or dispossess the tenant of the beneficial enjoyment of the premises and the effect of the act are matters of law, for the court; and further, that the question whether such acts do or do not amount to an eviction is to be left to the jury. An eviction is a turning out of possession, or placing the party in such a situation that, his expulsion being inevitable, he voluntarily surrenders possession, to save expulsion. It is said in 16 Cyc. 820 that:

"The idea that the ouster must be by process of law has been long since abandoned. Eliminating the old notion of an eviction, it may now be taken to mean this: not a mere trespass and nothing more, but something of a grave and permanent character done by the landlord with the intention of depriving the tenant of the enjoyment of the demised premises; and the term is now popularly applied to every class of expulsion or amotion."

See, also, Anderson's Law Dictionary 418, citing *Royce v. Guggenheim,* 106 Mass. 201.

In 2 McAdam on Landlord and Tenant (3d Ed.) 1302, cit-

ing the *Turpy* case, supra, it is said that a tenant is evicted when he leaves the premises during the term, in consequence of a notice to quit. Any act on the part of the lessor which shows an intent on his part permanently to deprive the tenant of quiet and peaceable enjoyment amounts in law to an eviction. *Isabella G. M. Co. v. Glenn*, 37 Colo. 165. See, also, *Central Business College Co. v. Rutherford*, 47 Colo. 277 (27 L. R. A. [N. S.] 637).

Plaintiff is presumed to have intended the natural and proximate consequences of his act in giving the notice; so that, if such notice resulted in dispossessing the tenant, by giving him justifiable cause to vacate the premises, then the law imputes the intention to the landlord, under the presumption stated. *Buchanan v. Orange*, (Va.) L. R. A. 1916 E 742; *Stewart v. Childs Co.*, (N. J.) L. R. A. 1915 C 649; Jones on Evidence, Section 27 (23).

Under the record, it was for the jury to determine the disputed fact question between the parties, and whether the giving of the notice, with all the other circumstances, rather than an agreement to surrender voluntarily, was the cause of defendant's surrendering the premises. We find no reversible error, and the judgment is, therefore,—*Affirmed*.

EVANS, C. J., WEAVER and DEGRAFF, JJ., concur.